UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RICHARD R. SODERMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 08-40183-FDS |
| ) | |
| MICHAEL J. ASTRUE, Commissioner, ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION TO REVERSE AND DEFENDANTS
MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

This is an appeal from the final decision of the Commissioner of the Social Security Administration denying plaintiff Richard R. Soderman's application for social security disability insurance ("SSDI") benefits. Plaintiff contends that the administrative law judge ("ALJ") erred by determining that plaintiff had failed to show that his impairments, individually or in combination, were disabling for at least twelve continuous months. Pending before the Court is plaintiff's motion to reverse the administrative decision and the Commissioner's motion to affirm.[1] For the reasons set forth below, the motion to affirm will be granted and the motion to reverse will be denied.

---

[1] The parties originally sought to reverse or affirm the ALJ's decision after it had been affirmed by the Decision Review Board. (AR at 1). On May 3, 2011, the Social Security Administration finalized regulations abolishing the Decision Review Board, effective June 13, 2011. 76 Fed. Reg. 24,802 (May 3, 2011). The Federal Register notice stated the agency's intent to transfer to the Appeals Council "all cases pending before the [Decision Review Board]" and "any cases remanded by a Federal court that [the agency] assigned to the [Decision Review Board]." *Id.* at 24,804. To allay concerns about longer processing times resulting from the transfers, the agency promised to "put the transferred cases at the front of the Appeals Council queue." *Id.* The Court will therefore analyze the motions now pending under the (substantially similar) regulations governing remands to the Appeals Council.

I.      **Factual Background**

Richard Soderman is 43 years old. (AR at 105). He earned a GED and has completed nearly two years of college. (*Id.* at 29). He has previously worked as a certified nursing assistant ("CNA"), a commercial delivery truck driver, and a driver's assistant. (*Id.* at 30, 42-43, 126, 150-53). Soderman last worked in September 1, 2003, the alleged onset of his disability. (*Id.* at 12, 109, 126). Since then, he has made some attempts at self-employment, which have ended, in part, due to his impairment. (*Id.* at 38-40). Soderman currently lives in Warren, Massachusetts, with his girlfriend and two teenage daughters. (*Id.* at 7, 28).

A.     **Medical Evidence**

1.     **Treatment at the Habit Management Institute**

Soderman has a substantial history of substance abuse. He testified that he has received methadone treatment since 1997. (*Id.* at 37). On January 13, 2004, he began substance abuse treatment at the Habit Management Institute in Springfield, Massachusetts. (*Id.* at 37, 183). He underwent a biopsychological assessment, which indicated that he had calm motor activity, appropriate affect, normal speech, intact thought process, and an appropriate, but depressed, mood. (*Id.* at 185). The assessment noted that Soderman had a good memory and good judgment when sober. (*Id.* at 186). He was ultimately diagnosed with opiate dependence and post-traumatic stress disorder, with a Global Assessment of Function ("GAF") of 44. (*Id.* at 187).[2] The assessment indicated that more information was needed to rule out the possibility that

---

[2] The Global Assessment Functioning Scale is used to measure the social, occupational, and psychological functioning of adults. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th Ed. 2000) ("DSM-IV-TR"). A score between 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

2

Soderman had seasonal affective disorder ("SAD"), depression, and bipolar disorder. (*Id.*). He continued to receive treatment at Habit Management through August 24, 2007. (*Id.* at 176-89, 407-62).

### 2. **Treatment with Dr. Leonhardt**

Soderman was treated at Wing Memorial Hospital for depression and anxiety by psychiatrist Dr. Marrilee Leonhardt from January 2005 through October 2007. (*Id.* at 191-301, 326-406, 463-507). Following the January 2005 evaluation, Dr. Leonhardt noted that Soderman's range of affect was constricted, his mood was dysphoric, and he complained of low energy and motivation and a general lack of interest in things. (*Id.* at 191). Dr. Leonhardt also noted that his speech was clear, goal-directed, and neither pressured nor delayed. (*Id.*). There was no evidence of psychosis and his attention, concentration, and memory were grossly intact. (*Id.*). Dr. Leonhardt recorded a diagnosis of opiate dependent mood disorder NOS (not otherwise specified), and rated Soderman's GAF at 58. Dr. Leonhardt prescribed Wellbutrin and referred him for individual therapy. (*Id.*).[3] She also explained to Soderman that many of his symptoms may be secondary to his opiate use. (*Id.*).

In February and March 2005, Soderman met again with Dr. Leonhardt. His mood was depressed; Dr. Leonhardt diagnosed major depression and opiate dependence. (*Id.* at 193-94). Dr. Leonhardt noted that when she discussed more aggressive depression treatment with Soderman during his March visit, he responded that he was not as severely depressed as he may have previously indicated. (*Id.* at 194).

---

[3] Wellbutrin is prescribed for the treatment of depression. Physician's Desk Reference, 2010 PDR 3270-4625.

In April 2005, Dr. Leonhardt noted that Soderman had not followed up with his therapist, and had stopped taking his medication because of mild heartburn, a headache, and because he was "afraid of pills." (*Id.* at 196). She noted that his mood was dysphoric, but his speech was clear and goal-oriented, there was no evidence of psychosis, his sleep was intact, and his affect range was appropriate to content. (*Id.*). Dr. Leonhardt diagnosed mood disorder, not otherwise specified, and noted that she would have to continue treating him to determine if the mood disorder was secondary to opiate use. (*Id.*).

In May 2005, at a further visit, Dr. Leonhardt diagnosed depression, not otherwise specified, with opiate dependence, and started Soderman on a trial regimen of Prozac in addition to Wellbutrin. (*Id.* at 197).[4] She strongly urged him to contact a therapist. (*Id.*). At a visit in June 2005, Dr. Leonhardt reported that Soderman liked the Prozac, seemed more energetic, was having fewer nightmares, and was crying less easily. (*Id.* at 198). Dr. Leonhardt thought this may be a secondary effect of reducing Soderman's methadone as well as a positive effect from the Prozac. (*Id.*). Soderman began seeing a therapist in July, who urged him to apply for work. (*Id.* at 230-32).

In August 2005, Dr. Leonhardt reported that Soderman was alert and oriented, had appropriate affect, with a normal attention span, no evidence of overt psychosis, no mood swings, intact memory, and fair insight and judgment. (*Id.* at 199). Dr. Leonhardt diagnosed major depression and opiate dependence. (*Id.*).

In September 2005, Dr. Leonhardt again diagnosed mood disorder, not otherwise

---

[4] Prozac is prescribed for, among other things, the treatment of depression, obsessive-compulsive disorder, and bulimia. Physician's Desk Reference, 2010 PDR 4600-3430.

specified, and noted that she would continue observing him to rule out bipolar disorder. She observed that he was complaining of racing thoughts, but he was alert and oriented, his affect was appropriate, his attention and speech were normal, his memory was intact, and his insight and judgment were fair. (*Id.* at 201). An October 2005 examination resulted in similar findings. (*Id.* at 203). Dr. Leonhardt noted that Soderman had always had trouble sleeping and was having vivid dreams, apparently related to his therapy. (*Id.*). She recommended him to undergo a sleep study. (*Id.*).

In early December 2005, Dr. Leonhardt noted that Soderman was complaining of anxiety, perhaps related to Christmas, and that he had not yet undergone the recommended sleep study. (*Id.*). She diagnosed major depression. (*Id.*). Later in December, after Christmas, Soderman complained of obsessive-compulsive-disorder-type symptoms and anxiety. (*Id.* at 207). He complained that he was having trouble finding a job and was resistant to work as anything other than a truck driver. (*Id.*). Dr. Leonhardt noted that he showed no signs of physical distress, and that his mental status was remarkable only for some anxiety. (*Id.*).

At a session in February 2006, Soderman reported to Dr. Leonhardt that he was still depressed but had only started taking Wellbutrin the prior week. (*Id.* at 209). She noted that he was not clear as to why he only recently started taking the medication; he simply stated that he does not like to take pills. (*Id.*). Soderman had still not scheduled a sleep study. (*Id.*).

At sessions in March, April, and May 2006, Soderman's mental examination results were fair to good—he was alert and oriented, he had appropriate affect and a normal attention span, there was no evidence of overt psychosis, he reported no mood swings, and he had an intact memory, normal speech, and fair insight and judgment. (*Id.* at 211-17). Dr. Leonhardt diagnosed

5

major depression with opiate dependence. (*Id.*). In May, Soderman stated that it had been a long time since he worked, and he found that to be a major source of stress. (*Id.* at 217).

At a session in July 2006, the results of a mental examination remained the same, but Soderman complained of depression, inability to concentrate, and feeling out of control. (*Id.* at 219). Dr. Leonhardt noted that he had stopped taking his medication about a month and a half ago because he was too busy to get it from the pharmacy. (*Id.*). In addition, he was stressed because a business venture selling collectibles from a pushcart in a mall had failed, resulting in financial loss. (*Id.* at 39, 219).

At a session on August 1, 2006, Dr. Leonhardt noted that when Soderman was observed in the waiting room, he seemed fairly alert, chipper, interactive, and had an increased range of affect. (*Id.* at 221). However, when he came into her office, he quickly became lethargic and confused with "poor attention and concentration." (*Id.*). At a session on August 17, 2006, the results of a mental examination remained fair to good, although Soderman complained of anger and insomnia. (*Id.* at 223). Dr. Leonhardt changed her diagnosis to mood disorder, not otherwise specified. (*Id.*). She also noted that he had failed to show up for some appointments and had yet to take the sleep study. (*Id.*).

At a session on August 31, 2006, Dr. Leonhardt noted that for his last several visits, she had been able to observe Soderman for some time in the waiting room, watching him interact with others. (*Id.* at 225). Again, Dr. Leonhardt noted that when he did not realize that he was being observed, Soderman was spontaneous in his speech, goal-directed, had no problems putting words together, and had a wide range of affect. (*Id.*). However, when in her office, he "present[ed] as severely constricted," seemed to have great difficulty putting thoughts together,

6

and stated that he feels disjointed and depressed. (*Id.*). Dr. Leonhardt wrote "I am having a strong inclination that this patient is magnifying his symptoms, manipulating his presentation. Most likely towards the goal of permanent disability finding." (*Id.* at 226).

At a session in September 2006, Soderman complained of decreased energy, reduced attention and concentration, and depression. (*Id.* at 227). The results of his mental examination remained the same. (*Id.*). In October 2006, Dr. Leonhardt changed her diagnosis to depression with opiate dependence. (*Id.* at 290). She noted that Soderman complained of conflict with his family and stated he felt he would be doing better if he had a job. (*Id.*). She also noted that he had still not scheduled a sleep study, and recommended that he try to engage more fully in treatment. (*Id.*). Specifically, she noted that he "has not followed up with the [treatment] recommendations for many years . . . ." (*Id.* at 290-91).

At a session in November 2006, Soderman reported that he had stopped taking his medication, stating that he was running out of medication and was disgusted. (*Id.* at 296). The results of his mental examination remained the same with the results being fair to good; Dr. Leonhardt changed her diagnosis to mood disorder, not otherwise specified. (*Id.*).

At a session in August 2007, Dr. Leonhardt noted that Soderman had not been seen since January 2007 and has been off his medications. (*Id.* at 334). He complained of anger and insomnia, but the results of his mental examination remained the same. (*Id.*). Dr. Leonhardt diagnosed him with mood disorder, not otherwise specified, personality disorder, not otherwise specified, and opiate dependence. (*Id.*). At a session in October 2007, Soderman reported that he had not been compliant with Dr. Leonhardt's treatment plan from August, and complained of anger and irritability. (*Id.* at 336). Dr. Leonhardt noted that he was irritable and difficult to

follow, but the results of his mental status examination remained fair to good.  (*Id.*).

In September 2007, Soderman finally underwent a sleep study.  (*Id.* at 463).  The study concluded that while "there is low sleep efficiency" and "excessive wakefulness after sleep onset," that "[s]ignificant obstructive sleep apnea syndrom is not seen."  (*Id.*).

### 3. Social Security Administration Review of Soderman's Medical Records

In November 2006, Lawrence Langer, Ph.D., a Disability Determination Service staff psychologist, reviewed Soderman's medical records to assess his mental Residual Functional Capacity ("RFC").  (*Id.* at 303-320).  Dr. Langer noted that he displayed some symptoms of decreased energy, feeling down, and isolative behavior.  (*Id.* at 305).  He ultimately concluded, based on the medical evidence to that point, that there were no limitations to Soderman's understanding and memory, sustained concentration and persistence, or adaptation.  (*Id.* at 303-05).  Dr. Langer noted that Soderman was somewhat limited in his social interaction in that he was moderately limited in his ability to get along with his coworkers without distracting them.  (*Id.* at 304).

In March 2007, Chang-Wuk Kang, M.D., a psychiatrist, completed a review of Soderman's medical records to determine his ability to perform work-related activities.  (*Id.* at 322-25).  Dr. Kang concluded that his ability to understand, remember, and carry out instructions was not affected by his impairment.  (*Id.* at 322).  Dr. Kang also concluded that Soderman was moderately limited in interacting appropriately with the public, and that he was mildly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting.  (*Id.* at 323).  While Dr. Kang found that his impairment did not limit his ability to interact appropriately with co-workers, it did mildly affect his ability to interact appropriately with

supervisors. (*Id.*). Dr. Kang concluded that Soderman "is able to follow instructions, he has minimal limitation in concentration, moderate limitation in dealing with general public but he can interact otherwise and his adjustment is mildly limited." (*Id.* at 325).

### 4. The Administrative Hearing Testimony

At the administrative hearing on March 21, 2008, Soderman testified that he has difficulty sleeping at night and spends most of the day in bed or walking around the house. (*Id.* at 32). He testified that he suffers from anxiety attacks that were caused by being around people and the unknown. (*Id.* at 33-34). When asked by the ALJ why he tried to sell collectibles in the mall when being around people gives him anxiety attacks, he replied "[b]ecause that's what I wanted to do." (*Id.* at 39). He also testified that he has difficulty concentrating, cannot handle stress, and has trouble remembering when to take is medication and go to appointments. (*Id.* at 35-36). He further testified that he has no family or friends, and he does not get along well with other people. (*Id.* at 36).

## II. Procedural Background

Plaintiff applied for SSDI benefits on October 2, 2006, alleging that he became disabled on September 1, 2003. (AR at 10, 105-09). The application was denied on initial review on November 8, 2006, and subsequently by a federal reviewing official on July 5, 2007. (*Id.* at 10, 56-69). Plaintiff requested an administrative hearing, which was held on March 21, 2008. (*Id.* at 23-52). Both plaintiff, who was represented by counsel, and a vocational expert testified. (*Id.*).

The ALJ issued its decision on April 23, 2008, denying plaintiff's claim. (*Id.* at 18). On July 21, 2008, the Decision Review Board affirmed the ALJ's decision, making the ALJ's decision the Commissioner's final decision. (*Id.* at 1). Having exhausted his administrative

remedies, plaintiff filed this complaint on September 19, 2008.  (Compl. at 1-2).  *See* 20 C.F.R. § 405.420(b)(2) (2010).

### III.     Analysis

#### A.     Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive," 42 U.S.C. § 405(g), because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ.  It does not fall on the reviewing court."  *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001) (citation omitted); *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (noting that the court "must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence"); *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981) ("'[I]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.'" (citation omitted)).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Questions of law, to the extent that they are at issue in the appeal, are reviewed *de novo*.  *Seavey*, 276 F.3d at 9.

#### B.     Standard for Entitlement to SSDI Benefits

An individual is not entitled to SSDI benefits unless he or she is "disabled" within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(a)(1)(A), (d) (setting forth the

definition of disabled in the context of SSDI). "Disability" is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be severe enough to prevent the plaintiff from performing not only past work, but any substantial gainful work existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[5] "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that juncture, the ALJ assesses the claimant's residual functional capacity ("RFC") in combination with the "vocational factors of [the claimant's] age, education, and work

---

[5] "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process." *Seavey*, 276 F.3d at 5.

experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

### C. The Administrative Law Judge's Findings

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4), but concluded that plaintiff was not disabled. (AR at 12-18).

At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since September 1, 2003, the alleged onset date of his disability. (*Id.* at 12).

At the second step, the ALJ found that plaintiff had severe impairments of mood and personality disorders with a history of substance abuse. (*Id.*). The ALJ also considered plaintiff's physical impairments—specifically, his history of a ganglion cyst on his right hand, surgery for a collapsed lung, and alleged sleep apnea—but concluded that these conditions were not severe impairments within the meaning of the Social Security Act. (*Id.* at 12-14). In determining that the ganglion cyst and collapsed lung did not constitute a severe impairment, the ALJ relied on plaintiff's testimony that neither imposed any ongoing limitations. (*Id.* at 12). In determining that the plaintiff's alleged sleep apnea was not a severe impairment, the ALJ referred to the September 2007 sleep study, which did not reveal signs of sleep apnea. (*Id.* at 14, 463).

At the third step, the ALJ determined that plaintiff's severe impairments of mood and personality disorders with a history of substance abuse did not meet the requirements for one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 14-15). In making this determination, the ALJ considered plaintiff's longitudinal treatment history and concluded that it did not establish that his mental impairments were continuously disabling for twelve

months.  (*Id.* at 14-15).

At the fourth step, the ALJ considered plaintiff's RFC and past relevant work.  He determined that plaintiff had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations:  he should not work in a position that requires more than occasional interaction with coworkers and supervisors, nor be in proximity of others on a continuing basis.  (*Id.* at 15).  Specifically, the ALJ determined that he could work in isolation, with generally one contact with a supervisor every four hours.  (*Id.*).  The ALJ also determined that he should not be in a position in which road rage would be a significant possibility.  (*Id.*).

Comparing plaintiff's RFC with his past relevant work, the ALJ found based on the vocational expert's testimony that he could not perform his past relevant work as a truck delivery driver or as a certified nurse's aid.  (*Id.* at 16).

The ALJ then proceeded to the fifth step.  He determined, in light of plaintiff's age, education, work experience, and RFC, that he could perform work existing in significant numbers in the national economy.  (*Id.* at 17).  Based on the testimony of a vocational expert, the ALJ determined that he could work the night shift in occupations such as a gate guard/night watchman or office cleaner.  (*Id.*).  The ALJ then found that he was not disabled as defined by the Social Security Act.  (*Id.*).

Plaintiff contends that the ALJ erred in step three of his analysis by determining that he failed to show that his impairments, individually or in combination, were disabling for at least twelve continuous months.  Plaintiff does not mention any specific erroneous factual or legal findings made by the ALJ.  Rather, he argues that his medical records taken as a whole "clearly establish disability for twelve continuous months," and that the ALJ did not adequately consider

evidence from his medical records that demonstrate his depression, anxiety, and problems sleeping. (Pl. Mem. at 7, 11).

### D. Continuous Disability for Twelve Months

Plaintiff contends that the ALJ's determination that his longitudinal treatment history, including treatment for depression, anxiety, and sleep problems, did not establish disability for twelve continuous months was erroneous and unsupported by substantial evidence.[6]

Specifically, plaintiff argues that the ALJ erred by not adequately considering evidence in the record of his treatment history with Dr. Leonhardt and his testimony about his symptoms due to anxiety and lack of sleep. The Commissioner contends that the ALJ's determination regarding plaintiff's lack of continuous disability was supported by substantial evidence, and that Dr. Leonhardt, while noting plaintiff's subjective complaints, reported the positive results of plaintiff's mental status exams and his suspicion that plaintiff was exaggerating his symptoms. The Commissioner argues that substantial evidence supported the ALJ's determination that plaintiff's impairments were not disabling for twelve continuous months, and that the ALJ was within his discretion to not fully credit plaintiff's hearing testimony.

Step three of the sequential evaluation process requires the Commissioner to determine whether plaintiff's limitations existed at a disabling level for a continuing period of twelve months. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(iii). To meet this standard, plaintiff's impairments, singly or in combination, must meet the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. In proving that he meets the criteria of a listed impairment, plaintiff must prove that

---

[6] Although not directly argued by plaintiff, in substance he alleges that the ALJ erred in step three of the five-step analysis.

14

his impairment creates "functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. Pt. 404, Subpt. P App. 1, 12.00(A).  To do this, plaintiff must prove that his impairment satisfies at least two of the following "paragraph B" criteria:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04(B), 12.08(B), 12.09(B).

Here, the ALJ determined that plaintiff's medical history does not establish continuous disability for twelve months, and that plaintiff's mental limitations failed to satisfy at least two of the paragraph B criteria.  (AR at 14-15).  Specifically, the ALJ found that absent substance abuse, plaintiff would have mild restrictions in activities of daily living, marked difficulties in social functioning, moderate difficulties in maintaining concentration, and no episodes of decompensation.  (*Id.* at 15).

In making this determination, the ALJ relied on the complete record, including Dr. Leonhardt's treatment notes, plaintiff's credible testimony and subjective complaints, and the assessments of plaintiff's medical record by Dr. Langer and Dr. Kang.  (*See id.* at 13-16, 221, 225-26, 290-91, 303-25).

Dr. Leonhardt's treatment notes indicate that plaintiff regularly complained about various general symptoms and occasionally specific ailments, such as anger and racing thoughts.  Dr. Leonhardt's notes also demonstrate that the results of plaintiff's mental examinations were consistently fair to good.  Based on this, Dr. Leonhardt's diagnosis regularly alternated between severe depression and mood disorder, not otherwise specified.  Dr. Leonhardt noted that these

15

diagnoses may be related to plaintiff's opiate dependence. The ALJ considered the occasions in plaintiff's medical history where he suffered from anger and other particularly debilitating complaints in light of this broader context, finding those complaints to be "rare instances . . . in response to situational stressors," not uncontrollable continuous impairments. (*Id.* at 14).

The ALJ also considered the assessments by Dr. Langer and Dr. Kang, both of whom evaluated plaintiff's medical records and similarly concluded that while he was somewhat limited in his interactions with others, he was not markedly limited in his ability to do work related activities. (*Id.* 13-15, 303-25).

Plaintiff contends that despite relying on this evidence to find that he failed to prove continuous disability, the ALJ erred by not adequately considering his hearing testimony and subjective complaints to Dr. Leonhardt. However, the administrative record demonstrates that the ALJ did consider this evidence, but did not find plaintiff to be fully credible. (*See id.* at 13, 16). It is the role of the ALJ, not the reviewing court, to resolve this type of conflicting evidence and making credibility determinations. *See Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).

Here, the ALJ concluded that some of plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible . . . ." (AR at 16). In considering plaintiff's medical history, the ALJ considered that Dr. Leonhardt had a strong inclination that plaintiff "was magnifying his symptoms and manipulating his presentation, most likely towards the goal of permanent disability finding." (*Id.* at 13). The ALJ further noted that plaintiff frequently did not take his medication, and referred to Dr. Leonhardt's references to the fact that he did not follow up on his treatment. (*Id.*). The fact that plaintiff did not pursue all of

16

his treatment recommendations is evidence upon which the ALJ could reasonably rely to conclude that his subjective complaints were not credible. *See Ortiz*, 955 F.2d at 769.

Examining the record as a whole, the Court finds that there is substantial evidence to support the ALJ's conclusion. Plaintiff contends that the ALJ erred by "not adequately considering the substantial evidence in the record *for* the existence and severity of [plaintiff's] mental disabilities." (Pl. Mem. at 11 (emphasis added)). Even if plaintiff is correct in contending that the administrative record contains evidence that *could* reasonably establish continuous disability, it does not necessarily follow that the ALJ lacked substantial evidence that it did not. *See Ortiz*, 955 F.2d at 769; *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987). This is especially true with this record, where apart from plaintiff's subjective complaints and hearing testimony, there is little evidence that plaintiff was continuously disabled for twelve months, while there is substantial evidence that he was not.

### III. Conclusion

For the foregoing reasons, plaintiff's motion to reverse the decision of the Commissioner is DENIED, and the Commissioner's motion to affirm is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor<br>F. Dennis Saylor IV<br>United States District Judge

Dated:  September 30, 2011